## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JON HOUSER<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>CORIZON, et al.<br><br>　　　　　　Defendants. | Case No.1:13-cv-00006-EJL-REB<br><br>**REPORT AND RECOMMENDATION ON MOTION FOR SUMMARY JUDGMENT (DKT. 74).** |

Pending before the Court is a Motion for Summary Judgment (Dkt. 74) that has been filed on behalf of Defendants in the above-entitled case. On January 21, 2015, this case was referred to the undersigned United States Magistrate Judge for all pretrial matters. (Dkt. 47). On September 9, 2016, the District Court also referred a Motion in Limine (Dkt. 75), which raises certain issues intertwined with the Motion for Summary Judgment. Having reviewed the record, including the briefing and affidavits of the parties, the Court concludes that the matter is suitable for disposition without oral argument and accordingly, enters the following Report and Recommendation.

## BACKGROUND

### A.    Summary of Allegations and Recommended Disposition

This is an Eighth Amendment deliberate indifference case. The Plaintiff, Jon Houser, is a man in his late fifties who suffers from Heptatis C as well as arthritis in his left knee. At the pertinent time periods, Houser was incarcerated at the Idaho State

**REPORT AND RECOMMENDATION - 1**

Correctional Institution ("ISCI"). The Defendants are Corizon Medical Services (hereafter "Corizon") and two Corizon physicians, Dr. Scott Lossman and Dr. Garth Gulick.

The crux of Plaintiff's case alleges poor care received from Defendants regarding treatment of his left knee and of his Hepatitis C. The Complaint (which Plaintiff filed *pro se*) raised numerous issues with respect to the treatment he received for these conditions; however, the issues have been winnowed considerably. At this juncture, Plaintiff's allegations of deliberate indifference are twofold. First, he argues that the decision to allow him to undergo arthroscopic surgery on his knee constituted deliberate indifference, because the regimen of his Hepatis C medications suppressed his immune system and made him vulnerable to infection. Therefore, he contends that he should not have been allowed to undergo surgery in the first place.

Plaintiff also complains of Defendants' treatment of a MRSA infection contracted after surgery, affecting a knee joint. According to Plaintiff, the MRSA infection was serious and life-threatening, was not discovered quickly enough, and was not properly recognized as an emergency when it was discovered. Further, he alleges that poor management of this infection caused him to undergo two additional debridement procedures, and to suffer some permanent loss of mobility. Other facts related to the decision to perform surgery and the treatment of the MRSA infection will be discussed in the body of this opinion.

The complaint was filed in January of 2013 (after an initial review order had been

**REPORT AND RECOMMENDATION** - **2**

issued by the Court). (Dkt. 1). In December of 2013, the Defendants filed a partial motion to dismiss (that was later converted into a motion for summary judgment) arguing that Plaintiff had not properly exhausted intra-prison remedies as required by the Prison Litigation Reform Act ("PLRA"). On August 27, 2014, the Court dismissed certain counts on  exhaustion grounds but allowed certain others to proceed. (Dkt. 43). Thereafter, the parties conducted discovery and agreed to dismiss certain Defendants.

The remaining Defendants filed the instant motion on May 20, 2016. In addition to arguing that the Plaintiff cannot establish the necessary elements of a deliberate indifference claim, these Defendants also argue that the District Court previously dismissed all claims related to the post-operative care of Plaintiff's MRSA infection when it dismissed Count VII on exhaustion grounds. Finally, Defendants submit that all claims arising prior to January 4, 2011 must be dismissed on the basis that the Complaint was filed after expiration of applicable statute of limitation.

After a careful consideration of the briefing and the record, the undersigned concludes that Plaintiff's current theory that the care and treatment he received for his MRSA infection after the surgery constituted deliberate indifference should be allowed to proceed, and further concludes that such a claim was *not* dismissed in the District Court's previous summary judgment ruling. The District Court did dismiss Count VII; however, that count concerned only the failure to remove Plaintiff from his Hepatitis C medication after the surgery and not other theories of deliberate indifference having more generally to do with Dr. Lossman's care of the post-operative MRSA infection. The latter theories

**REPORT AND RECOMMENDATION** - 3

are more properly considered under the umbrella of Count III, which survived the earlier motion for summary judgment. Similarly, nothing in Judge Lodge's previous opinion suggests an intent to dismiss those aspects of Plaintiff's claims that have to do with the decision to allow Plaintiff to undergo surgery in the first place.

As to the substantive deliberate indifference issues, Plaintiff has established that there are genuine issues of material fact on the question of whether Dr. Lossman acted with the state of mind necessary to prove such a claim when it came to the treatment of Plaintiff's post-operative MRSA infection. However, Plaintiff puts forward no evidence evidence directly indicating or inferring that Dr. Gulick's medical errors (if any) rose to the level of deliberate indifference. Nor has he submitted any evidence to support the allegation in his Complaint that Corizon had either a formal or informal policy of providing substandard medical care in order to save costs. Finally, the Defendants' argument as to the statute of limitations issue is well-made in that Plaintiff's submissions do not raise any issue with respect to medical care provided prior to January 4, 2011.

For these reasons, the undersigned recommends that the underlying motion be granted in part and denied in part. The combined effect of such rulings would be that this case would proceed to trial on a single Count, Count III, on the specific question of whether Dr. Lossman acted with deliberate indifference with respect to his treatment of Plaintiff's post-operative MRSA infection.

## LEGAL STANDARDS

**1.      Summary Judgment**

**REPORT AND RECOMMENDATION** - **4**

Summary judgment is appropriate where a party can show that, as to a particular claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id. at 327.* "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment ...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). Rather, there must be no genuine dispute as to any material fact in order for a case to survive summary judgment. Material facts are those "that might affect the outcome of the suit." *Id.* at 248. Disputes over facts that are not material to the resolution of the motion will not preclude summary judgment. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party is entitled to summary judgment if that party shows that each material fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

**REPORT AND RECOMMENDATION - 5**

If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson,* 477 U.S. at 252.

## ANALYSIS

**A.      Whether the Theories Plaintiff is Currently Pursuing Were Dismissed**

Sorting out the issue of what aspects of Plaintiff's claims were previously dismissed by Judge Lodge requires a detailed examination of the procedural history of this case, including specific allegations of the Complaint, the positions taken by parties in prior briefing, and certain portions of the Court's previous order. As indicated above, Defendants argue that claims relating to the care of the post-operative MRSA infection were dismissed when the Court dismissed Count 7 on exhaustion grounds. Plaintiff, on the other hand, argues that these issues fall under the rubric of Count III or Count VI, two of the counts that were not previously dismissed.

In deciding these issues, the Court first looks to the content of Count VII, which alleges that Plaintiff's constitutional rights were violated:

> By Defendants Garth Gulick, Scott Lossman, and Mark Spelich, failure to remove Jon Houser from the Hepatitis C treatment after the first MRSA outbreak, amounts to deliberate indifference, in violation of his Eighth Amendment right to the United States Constitution.

**REPORT AND RECOMMENDATION - 6**

(Dkt. 1 at p. 17).[1] The language of this count may be inartful, but it is clear that this count references only the alleged failure to remove the Plaintiff from the Hepatitis C treatment after his knee surgery, and not any other aspect of the post-surgical care. There is no mention of the theories that Plaintiff is now pursuing, as to whether the MRSA infection was recognized in a timely fashion and whether it was treated sufficiently aggressively, particularly with respect to the selection of antibiotics.

The undersigned has considered that Judge Lodge, in dismissing Count VII on exhaustion grounds, said that "*none of [Plaintiff's] grievances address the treatment of Plaintiff's MRSA after his April 14, 2011 surgery* and the fact that he should have been removed from his Hepatitis C anti-viral medication sooner so that the MRSA could be adequately treated." (Dkt. 43 at p. 14) (emphasis added). The opinion goes on to say that as to one particular grievance, *"[Plaintiff] is seeking treatment for Hepatitis C, not grieving the delay or inadequate care for his MRSA outbreak."* (Emphasis supplied.) However, although these statements could be argued to somehow call for dismissal of all claims related to post-surgical treatment, the context of such language in Judge Lodge's

---

[1] After Plaintiff obtained counsel, he sought leave to amend his complaint, in part to add state law claims for medical malpractice. Though the Court granted Plaintiff's request to amend in certain respects, it also held that amending the complaint to add state law negligence claims would be futile, due to his failure to comply with the pre-lawsuit screening requirements of I.C. § 6-1001 et seq. (Dkt. 56). The one exception was that the Court allowed him to pursue a medical negligence claim against Dr. Gulick, arising from the claim that he had not obtained informed consent for the surgery and subsequent debridement procedures. However, Plaintiff did not amend his complaint along this line. Thus, the operative Complaint is still the original one, filed when Plaintiff was proceeding on his own behalf. Further, the only claims at issue at this point are Eighth Amendment claims for deliberate indifference, which was the only cause of action pled in the original Complaint.

**REPORT AND RECOMMENDATION - 7**

prior opinion must be considered against the discrete scope of Count VII's actual language, which only raised very limited issues with respect to the post-surgical care. The undersigned will not read into the District Court's prior decision an intent to dismiss claims that were not apparent within the scope of Count VII.

As described, the scope of Count VII was quite narrow. Count III, in contrast, was much broader in scope and alleges a general failure on the part of Defendants to treat the Plaintiff's knee and foot pain:

> Due to Defendants Garth Gulick, and Scott Lossman's failure to treat Jon Houser's severe (L) knee and feet pain, and atrophy, amounts to deliberate indifference in violation to his Eighth Amendment right to the United States Constitution.

(Dkt. 1 at p. 16). Though it is not entirely clear what time frame the Plaintiff is referring to when he references the failure to treat severe knee pain, (and there are allegations in the factual narrative portion of the Complaint dating back to 2009), Count III on its face is broad enough to cover the MRSA infection and the allegedly inadequate care Plaintiff received related to that infection after his surgery. The factual narrative section of the Complaint itself also references a number of alleged errors that occurred *after* the surgery, in addition to the allegedly indifferent failure to remove Plaintiff from his Hepatitis C treatment. This portion of the Complaint alleges, for example, that Plaintiff began to feel ill as early as April 15, 2011. (Dkt.1, p. 10). It also alleges that an exam by a physician's assistant on April 21, 2011 noted drainage and possible pus coming from the left knee. But it was another six days before Plaintiff was seen by an off-site provider, at which

**REPORT AND RECOMMENDATION - 8**

point he had to undergo a second surgery to clean out the MRSA-infected joint. (*Id*. P.

10-11). The Complaint also references the second debridement that occurred some weeks

later and, significantly for these purposes, also alleges that Dr. Lossman did not provide

an appropriate antibiotic dosage once he became aware of the infection. (Id.).

Finally, in arguing that the claims raised by Count III had in fact been fully

grieved internally, Plaintiff's counsel made the following specific assertion that this count

was intended to cover post-surgical issues:

> One of the primary bases for the instant action against the Corizon defendants is those actors' tortious conduct in contributing to the severe MRSA infection suffered by the Plaintiff. Obviously, the MRSA infection occurred *after* the knee surgery, so the date of Plaintiff's initial grievance being six months after the knee surgery, is not particularly relevant."

(Dkt. 28 p. 10). These remarks were made in the context of Plaintiff's arguments as to

why Count III should not be dismissed.

In ruling on exhaustion issues, Judge Lodge said it was not entirely clear what

time frame was referenced in Count III. Judge Lodge also said  that he was assuming "for

purposes of this motion," that Count III referred to treatment of the Plaintiff's left knee

*prior to* his surgery on April 14, 2011. (Dkt. 43, p. 12-13). However, it appears that Judge

Lodge's assumption in this regard was drawn from the Defendants' own characterization

of Count III in making their case for dismissal on exhaustion grounds.[2] (Dkt. 22-1 at p.

---

[2] In their opening brief in support of their partial motion to dismiss, Defendants noted that the Count III "did not have a time frame," and that the Complaint generally referenced pain related issues in the left knee dating back to 2009 and continuing on into 2011. (*Id.*).

**REPORT AND RECOMMENDATION** - **9**

12).  Plaintiff's first intra-prison grievance regarding his knee was not made until November 30, 2011. Thus, to the extent that Defendants could persuasively argue that Count III dealt with earlier matters, the more likely they were to be successful in convincing the Court that the issues raised by that count had not been timely grieved.

Judge Lodge ultimately rejected the Defendant's argument that Count III had not been properly grieved, noting that the November 30, 2011 grievance (Grievance No. 11000179) stated that Plaintiff had been "permanently crippled" by the actions of various Corizon providers. He further concluded that because the prison had elected to process this grievance rather than deny it as untimely, it could not now claim that issues raised by the grievance had not been properly exhausted. (*See,* Memorandum Decision and Order, Dkt. 43, p. 12-13).  In other words, in considering the arguments made by Defendants in regard to Count III, the District Court simply adopted Defendant's assumptions for purposes of deciding the exhaustion issues before it, and then rejected those arguments. Such an approach was entirely sensible in the context of the issues then before the Court, but that landscape of case has since changed.  Therefore, such a chain of events should not be presumed to indicate that Judge Lodge's prior decision was intended to rule, effectively *sub silentio*, on other aspects of Plaintiff's claims that were otherwise within the scope of Count III and properly raised within the factual narrative of the  Complaint.

For all these reasons, Defendants' argument that the District Court intended to dismiss all aspects of Plaintiff's claims regarding post-MRSA care evaporates on close inspection. Finally, it is also significant for these purposes that Defendants are not

**REPORT AND RECOMMENDATION - 10**

prejudiced or unfairly surprised (nor do they contend to be) by the fact that the focus of Plaintiff's claims ultimately came down to issues related to the post-surgical treatment of the MRSA infection. Indeed, this subject was addressed extensively in the discovery process, and the Plaintiff's own expert has submitted an affidavit that addresses these very issues in some detail. (Keller Affidavit, Dkt. 74-34). Therefore, the undersigned recommends that the District Court decline Defendant's invitation to read into the Court's prior order an intention to dismiss all aspects of Plaintiff's claims having to do with the Defendants's care of his post-operative MRSA infection.

**B.      Whether Plaintiff Has Sufficiently Alleged Deliberate Indifference**

Next, the Court considers whether Plaintiff has sufficiently alleged deliberate indifference with respect to each remaining Defendant. First, however, the Court addresses certain evidentiary issues raised by Defendants' Motion in Limine.

**1.      Defendants' Motion in Limine (Dkt. 75).**

Defendants challenge the admissibility of certain opinions from Plaintiff's expert witness, Dr. Eugene Ginchereau. The expert report of Dr. Ginchereau contains criticisms of the medical care provided by Dr. Gulick and Dr. Lossman as to the decision to go forward with knee surgery and as to the post-surgical care of the MRSA infection. The Defendants deposed Dr. Ginchereau, and therefore for these purposes his deposition testimony provides further context for the opinions contained in his report.

Defendants raise five separate arguments for barring Dr. Ginchereau's opinions. The first contention is that Dr. Ginchereau's opinions are irrelevant because they relate to

**REPORT AND RECOMMENDATION - 11**

Counts that have been dismissed. (See Defendants' Brief, Section "A", Dkt. 75-1 at p. 3). The premise is lacking, because the undersigned recommends in this decision that Plaintiff can proceed with his claims related to post-operative MRSA care.

Defendants then argue in the alternative that any of Dr. Ginchereau's opinions that the Defendants violated the applicable community standard of care are irrelevant, because Plaintiff was not allowed to pursue state law negligence claims. (See Defendants' Brief, Section "B," Dkt. 75-1 at p. 4).[3] Further, they contend that Dr. Ginchereau's opinions are irrelevant because at most, they suggest a difference of opinion between medical providers. (Defense Brief at section "C," Dkt. 75-1, p. 5). Defendants' third argument asserts that Dr. Ginchereau's opinions are inadmissible because Dr. Ginchereau lacked the proper foundational knowledge necessary to express those opinions. (Defense Brief at section "D," Dkt. 75-1, p. 7). Finally, Defendants contend that certain of Dr. Ginchereau opinions specifically stating that the Defendants' conduct amounted to recklessness and deliberate indifference, were disclosed after the deadline to submit expert opinions and are not a proper Rule 26(e) supplementation. (Defense Brief at section "E," Dkt. 75-1, p. 11).

Various of these arguments are not admissibility challenges, but rather arguments

---

[3]  Defendants' Brief in support of the Motion in Limine references the informed consent claim against Dr. Gulick as though it were an extant claim. (Dkt. 75-1 at p. 10). Previously, the Court allowed Plaintiff to file an amended complaint containing a claim against Dr. Gulick based on the alleged failure to obtain informed consent for the initial knee surgery and the two debridement procedures. However, Plaintiff did not file an amended complaint, and thus, Defendants' assertion in its brief in support of the Motion for Summary Judgment that the only viable claims are the deliberate indifference claims is correct.

**REPORT AND RECOMMENDATION - 12**

that go to the weight and strength of Plaintiff's evidence. For example, the argument in Section C of the defense brief (i.e. the assertion that Dr. Ginchereau's opinions are irrelevant because they suggest nothing more than a difference of opinion between medical providers) is simply a way of restating, in the guise of an admissibility challenge, the difficult hurdle that a plaintiff must overcome before a deliberate indifference claim can reach a jury. The argument that Dr. Ginchereau is not qualified, under Rule 702 of the Federal Rules of Evidence, to testify as an expert with respect to the care Dr. Gulick rendered has somewhat stronger legs, because Dr. Ginchereau was somewhat equivocal when asked about his knowledge and expertise pertaining to the treatment of Hepatitis C patients and the relative risks and benefits of conducting surgery on such a patient. However, it is not necessary to resolve this somewhat more subtle foundational issue, because, even if admissible, Dr. Ginchereau's testimony is inadequate to establish that Dr. Gulick acted with the state of mind necessary to prove deliberate indifference. For these reasons, the undersigned concludes that defense arguments "C" and "A" regarding the admissibility of Dr. Ginchereau's opinions lack merit, and argument "D" is moot.

What remains then, are Defendants' last two arguments (items "B" and "E" in their brief). The first such argument contends flatly that allowing expert testimony upon whether the Defendants breached standards of care applicable in medical malpractice claims would serve no purpose in a deliberate indifference case, and would therefore be irrelevant testimony under Rule 403. However, resolving this particular issue is not necessary to resolve the underlying summary judgment motion, and questions of whether

**REPORT AND RECOMMENDATION** - 13

a particular piece of testimony will be relevant at trial are best left to the presiding judge. Accordingly, the undersigned will not rule on issue "B."

The arguments raised in Defendant's "Issue E" are also best left for later decisions. Defendants' argument here is that Dr. Ginchereau's specific statements that the Defendants acted with recklessness and deliberate indifference are inadmissible because they were disclosed after the relevant deadline had passed. (Defense Brief, Dkt. 75-1 at p. 13). Resolution of this issue is not also not necessary for purposes of the pending summary judgment motion, because there is sufficient evidence in Dr. Ginchereau's deposition testimony, and the inferences to be drawn from such evidence, by which a reasonable juror could conclude (even without the benefit of an opinion from Dr. Ginchereau as to the ultimate issue) that Dr. Lossman acted with deliberate indifference when it came to the treatment of Plaintiff's MRSA infection.

Further, even if Dr. Ginchereau's specific opinions upon the recklessness and deliberate indifference standards were disclosed after the relevant scheduling deadline for doing so, the issue of whether such opinions should be prohibited at trial is a matter for consideration under Rule 37(c). The parties, however, have not briefed this issue in these terms.[4] The undersigned will not rule on issues in that setting, particularly when such

---

[4] The question of whether the late-disclosed opinions can come in under Rule 37(c) may or may not matter, depending on the District Court's view of certain evidentiary issues relating to the proper scope of expert testimony in a deliberate indifference case. As the Defendants' note, Judge Winmill has observed that "in deliberate indifferent cases, medical experts cannot testify that a defendant was deliberately indifferent, which is an attempt to tell the jury what result to reach and which runs the risk of interfering with a district court's jury

**REPORT AND RECOMMENDATION - 14**

rulings involve an exercise of discretion on the part of the district judge when it comes to the testimony to be admitted at trial. Accordingly, the best course of action with respect to issues "B" and "E" may be for the District Court to moot these issues for the time being, and allow the parties to raise them in a more focused manner in future motions in limine, after having had the opportunity to digest the District Court's final ruling on the Motion for Summary Judgment.

### 2. Issues of Fact Exist as to the Deliberate Indifference Claim against Dr. Lossman

Dr. Ginchereau's deposition testimony is sufficient to create a genuine issue of material fact with respect to Dr. Lossman on the elements of a deliberate indifference claim. The undersigned acknowledges that on several occasions in his deposition testimony Dr. Ginchereau said that he did not believe that it was his place to criticize the care rendered by other doctors, or that he did not perceive his role as being one of finding fault with other professionals. Defendants focus on these comments, and argue that this case involves a mere a difference of opinion about medical care. (Ginchereau depo. Dkt. 78-4 at p. 46-48).

However, nothwithstanding his purported reluctance to do so, Dr. Ginchereau

---

instructions." *Stakey v. Stander,* 2011 WL 887563 (D. Idaho 2011) (internal quotations omitted). However, the Sixth Circuit cases to which that opinion cites frame the issue as one of discretion for the presiding judge. *Woods v. LeCureux,* 110 F.3d 1215, 1222 (6th Cir. 1997); *Berry v. City of Detroit,* 25 F.3d 1342, 1353 (6th Cir. 1994). *See also, M.H. v. County of Alameda,* 2015 WL 54400 at * 1 (N.D. Cal. 2015) (discussing generally the problem of defining how far expert testimony in a deliberate indifference case may go, and identifying a distinction between invoking legally significant terms such as "deliberate indifference" and simply allowing an expert to testify as to applicable standards of care).

**REPORT AND RECOMMENDATION** - 15

spoke in extremely strong terms about his opinions as to the various ways in which Dr. Lossman's care fell short of acceptable standards. A reasonable jury could infer that, in addition to breaching acceptable community standards of care, Dr. Lossman also acted with the state of mind necessary to establish deliberate indifference. While Dr. Ginchereau's comments that it was "not his place to criticize" may provide fodder for cross-examination, such comments do not erase opinions that do just that, particularly when the rules applicable to summary judgment motions require that the Court consider the record in the light most favorable to the Plaintiff, the non-movant.

### a. Legal Standards Specific to a Medical Deliberate Indifference Claim.

The Eighth Amendment requires adequate medical care in prison, and prison officials or prison medical providers can be held liable for Eighth Amendment violations if "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A prison official or prison medical provider acts with "deliberate indifference . . . only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) (*overruled on other grounds, Castro v. County of Los Angeles,* ___ F.3d ___, 2016 WL 4268955 (9th Cir. 2016) (citation and internal quotation marks omitted). In the medical context, proof of deliberate indifference requires a showing of both "a purposeful act or failure to respond to a prisoner's pain or possible medical need and . . . harm caused by the indifference." *Jett v. Penner*, 439 F.3d

**REPORT AND RECOMMENDATION** - 16

1091, 1096 (9th Cir. 2006). Deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05 (footnotes omitted). If medical personnel have been "consistently responsive to [the inmate's] medical needs," and there has been no showing that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," there has been no Eighth Amendment violation. *Toguchi* v. *Chung*, 391 F.3d 1051, 1061 (9th Cir. 2004). The standard for demonstrating subjective knowledge requires something more than negligence but something less than acting for the specific purpose of causing harm.  That standard can be satisfied by proof of  recklessness. *See Farmer v. Brennan,* 511 U.S. 825, 826 (1994)  Recklessness, in turn, may be demonstrated by showing that the defendant disregards a risk of harm of which he or she is aware. *Id.*

The Eighth Amendment does not, however, provide a right to a specific medical treatment. See *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[The plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). Therefore, a prison doctor's recommendation for a different or less costly treatment does not constitute deliberate indifference unless the recommendation "was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon v.*

**REPORT AND RECOMMENDATION** - 17

*Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998).

> ### b.    Dr. Ginchereau's Testimony

These opinions, given by Dr. Ginchereau, are of significance as to the deliberate

indifference claim against Dr. Lossman:

- Although Plaintiff's surgery occurred on April 14, 2011, based on the medical records, he did not have the benefit of a post-operative checkup until seven days later, on April 21, 2011. (Ginchereau depo. p. 48).[5] Dr. Ginchereau testified that it was unacceptable for an immuno-suppressed patient not to be seen for this long, because of the additional risk of developing an infection, and also due to the fact that a delay in diagnosis of days or even hours can be critical when it comes to treating an infection. (Depo. p. 49). Dr. Ginchereau testified that the patient should have been seen within two or three days after the surgery, and that as medical director, it would have been Dr. Lossman's responsibility to make sure that patients were seen as often as they needed to be seen. (*Id*. p. 49-50).

- On April 21, 2011, Plaintiff was seen by a Corizon nurse (though not, apparently, by Dr. Lossman). On that day, some discharge at the wound site was noted. While the Defendants point out that there was no pus or purulence associated with this discharge, Dr. Ginchereau testified that the clear fluid draining from the wound was a sign of infection, and that the wound should have been presumed to be infected on that day, especially in light of the Plaintiff's history of MRSA infections prior to the surgery and his compromised immune system. (Ginchereau Report, Dkt. 75-3 at p. 2& Ginchereau depo., p. 63).

- On April 24, 2011, a nurse informed Dr. Lossman that the Plaintiff had "cellulitis." According to Dr. Ginchereau, this diagnosis should have triggered an emergency room visit if it was identified after normal business hours or on the weekend. However, the patient was not sent to the emergency room, and Dr. Lossman did not see him until the next day. (Ginchereau depo., p. 51).

- When Dr. Lossman saw the patient on April 25, 2011, he actually considered septic arthritis (i.e. a staph infection within the joint itself) as part of

---

[5] The Ginchereau deposition is contained at Docket Nos. 78-4, 78-5, and 78-6. For ease of reference, the page numbers given in this discussion refer to the page numbers on the deposition transcript itself, which are sequential, rather than the non-sequential page numbers generated by the ECF system.

**REPORT AND RECOMMENDATION - 18**

his differential diagnosis. However, according to Dr. Ginchereau, Dr. Lossman did not do what he needed to do to make that diagnosis. According to Dr. Ginchereau, the acceptable options would have been to either 1) tap the joint (apparently a way to tell if the infection is in the joint itself), or 2) send the patient immediately to the ER. While either of these options would have been acceptable, delaying treatment was not. Dr. Ginchereau spoke about this particular alleged breach of the standard of care in very strong terms, saying,"you cannot, you cannot, delay."  Dr. Ginchereau testified that the failure to take further steps to diagnose the problem that day was "so fundamental to the practice of medicine that I can't even describe to you why, but if you have a disease that you consider a patient could possibly have that would lead to loss of limb or life, you must take action." (Depo. p. 50-51).

•      Dr. Ginchereau testified that the medications that Bactrim, the medication that Dr. Lossman initially prescribed after realizing that Plaintiff had an infection, was "totally inadequate" for a life or limb-threatening disease. (*Id.* p. 52-54). The same was true for Rocephin and Kephlex. Intravenous antibiotics, such as Vancomycin, were necessary. (*Id.* p. 54 & 59).

•      On April 27, 2011, Plaintiff was admitted to the ISCI infirmary, and on April 28, 2011 he underwent a debridement of the knee joint by Dr. Spelich. Dr. Ginchereau testified that the care Plaintiff received in the infirmary by both Dr. Lossman and Dr. Song (who is not a defendant in this case) was deficient. Dr. Ginchereau testified "the day after the admission to the infirmary, the patient is hypotensive, has a tachycardia. This is an immuno-suppressed patient post-op, serious surgery. That smells, of serious, serious infection with the possibility of sepsis, and nothing was done." (Depo. p. 60-61).

•      Dr. Ginchereau testified that if a culture or gram stain had been done the first time the patient was seen post-operatively, (i.e. on April 21, 2011), such test likely would have revealed the presence of MRSA. A culture also could have been done on the 23rd and 24th and 25th and 26th, but was not. (Depo. p. 60-61.)

•      A report showing MRSA was obtained on the 27th or 28th of April. (Depo. p. 67). While Dr. Lossman may not have been aware that MRSA had been positively identified at this point, he was aware that Plaintiff had some kind of infection at the wound site. However, Plaintiff was still not seen for several days after the positive identification of MRSA. (Depo. p. 68). Further, when Dr. Lossman did learn that the infectious agent was MRSA on May 3, 2011, he still waited another day to start Vancomycin. (Depo. p. 67-68).

**REPORT AND RECOMMENDATION** - 19

- Even after the Vancomycin was started, there was no indication that Dr. Lossman or any other member of the ISCI medical staff was seeing the patient from May 4 to May 8th. Nor was the patient seen from May 12th through the 15th. Dr. Ginchereau stressed that this was a patient with a known intra-articular septic infection, who was having fevers and anemia and who required opiate pain control. (Depo. p. 69-71). Dr. Ginchereau was also critical of the level of attention that was given when Dr. Lossman did see the patient. Specifically, he testified, "there's no sense that a history and physical examination were being done . . . there's no sense that there's clinical appreciation for what is developing and has developed and what could continue to develop and so the patient ends up for another irrigation and debridement." (P. 69-70).

Read in the light most favorable to the Plaintiff, a reasonable jury considering claims of deliberate indifference could conclude that Dr. Lossman ignored a serious medical problem: a post-surgical MRSA infection in an immuno-suppressed patient. Dr. Ginchereau opines that the combination of Plaintiff's infection (sepsis in the joint itself) and his immuno-compromised status, created a real threat of loss of life or limb. Proof that prison officials disregarded a known risk of injury is sufficient proof to state an issue of fact on a deliberate indifference claim. Further, although there is evidence that Dr. Lossman was unaware until May 3, 2011 that the infectious agent was, in fact, MRSA, he was aware of that the risk of such an infection was high for the very reason that he had recommended against the surgery in the first place.

Such a fact standing alone raises a reasonable inference that Dr. Lossman disregarded known risks, even during the earlier time frame of April 21 to April 24, 2011. Plaintiff's proof on the subjective knowledge prong of the deliberate indifference test becomes even stronger as the time-line moves forward, particularly given that a nurse informed Dr. Lossman on April 24, 2011 that the patient had "cellulitis." Even if a

**REPORT AND RECOMMENDATION - 20**

reasonable jury were inclined to give Dr. Lossman the benefit of the doubt as to his actions during the earlier time frame, the jury could nonetheless still conclude that at least after April 24, 2011, Dr. Lossman knowingly failed to treat Plaintiff's infection as the medical emergency it was.

To be sure, the above characterization is not only way of looking at the evidence in this case. It is a characterization drawn with reasonable inferences drawn in favor of the Plaintiff as the non-movant, and the Court does not overlook the fact that the Defendants have put forward counter-arguments that the facts amount to nothing more than a difference of medical opinion. Specifically, the defense expert, Dr. Jeffrey Keller, addressed the care provided to Plaintiff after his left knee arthroscopy in some detail and noted that the surgery was done on an outpatient basis, which means that an un-incarcerated individual would not have been seen until the regularly scheduled follow-up appointment. ( (Keller Affidavit, Dtk. 74-34 at ¶ 8). Dr. Keller also opined that it would have been medically unreasonable to send the patient to the ER on April 21, 2011 because no redness, warmth, swelling, pain, or pus was noted when Plaintiff was seen by the nurse on that date. He also stated that Dr. Lossman's decision to admit Plaintiff to the infirmary and to start Rocephin and Bactrim (as opposed to intravenous antibiotics) were clinically appropriate in light of his condition and the contention that these medications effectively covered the possibility of a methicillin-resistant infectious agent. (*Id.* ¶ 12).

The Court has taken into consideration this evidence, as well as long standing. Eighth Amendment case law holding that medical malpractice alone, or a dispute over the

**REPORT AND RECOMMENDATION - 21**

appropriate course of treatment, will rarely amount to deliberate indifference. *See, e.g.*
*Estelle v. Gamble,* 429 U.S. 97 (1976)*; Toguchi,* 391 F.3d at 1061; *Forbes v. Edgar,* 112
F.3d at 267. But while the Eighth Amendment may not guarantee prisoners the right to
state-of-the-art medical care, at the same time, the fact that a patient receives *some* care
does not necessarily insulate a provider from a medical deliberate indifference claim. *See,*
*e.g, Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998). For this reason,
the fact that Dr. Lossman prescribed certain antibiotics for Plaintiff does not mean that
this case involves nothing more than a difference of medical opinion. Dr. Ginchereau's
testimony, if believed, describes a medical emergency that was either ignored during
critical time frames, or else treated with inadequate means. It is up to the jury to decide
whether the Plaintiff's or Defendant's characterization of the evidence is more persuasive.

### 3.  Dr. Gulick, Corizon, and Claims Barred by Statute of Limitations

As to Corizon and Dr. Gulick, the evidence falls far short of creating genuine
issues of material fact on the deliberate indifference claims. Dr. Ginchereau addresses Dr.
Gulick's role in Plaintiff's' care solely in the context of the decision to go forward with
the arthroscopic surgery, despite Plaintiff's immuno-compromised condition. Unlike the
rather forceful criticisms that are directed against Dr. Lossman, Dr. Ginchereau's
opinions as to Dr. Gulick might best be described as equivocal, and Dr. Ginchereau
overtly acknowledges that there is room for difference of opinion on this point.
(Ginchereau depo., Dkt. 78-6 at p. 78-80). That acknowledgment takes the alleged
omissions and errors on the part of Dr. Gulick, if any, out of the realm of deliberate

**REPORT AND RECOMMENDATION - 22**

indifference. Finally, Plaintiff lacks evidence of a policy or procedure underlying the allegedly substandard medical care such that Corizon itself would be arguably liable for any constitutional violations. Nor does Plaintiff offer any specific argument about this issue. Therefore, the Court recommends that the District Court dismiss Dr. Gulick and Corizon.

Finally, Plaintiff offers no evidence or argument countering the suggestion that all claims arising before January 4, 2011 are barred by the applicable statute of limitations. Further, Dr. Ginchereau's opinions concern claims relating to the surgery that was conducted in April of 2011, and the post-operative care of the MRSA infection.  This aspect of the Defense motion is fully supported by the record and should therefore be granted.

## RECOMMENDATION

1.    The undersigned recommends that the Motion for Summary Judgment (Dkt. 74), be **GRANTED** as to Corizon and Garth Gulick, M.D. and **DENIED** as to Scott Lossman, M.D. The sole issue remaining for trial is whether Dr. Lossman acted with deliberate indifference when it came to his role in the care of Plaintiff's post-operative MRSA infection. The only Count that this issue fits under is Count III; therefore, all remaining counts should be dismissed.

2.    The undersigned further recommends that the Motion in Limine (Dkt. 75) be **DENIED** as to the issue discussed at section  "C"  in Defendant's brief

**REPORT AND RECOMMENDATION - 23**

and **DENIED AS MOOT** with respect to issues "A" and "D." Issues "B" and "E" involve matters of discretion for the trial judge, and the undersigned declines to issue recommendations on these matters at this time. The District Court, however, may wish to simply moot these two issues for the time being, while allowing the parties an opportunity to address them more fully in pre-trial motions in limine to be filed after the District Court issues its final decision on the Motion for Summary Judgment.

**3.**     Either party may file written objections to this Report and Recommendation.  Such objections must be filed within fourteen (14) days of the date of this Report, pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1.  If a party fails to raise objections in such a manner and time, that party may waive the right to raise factual or legal objections by appeal to the United States Court of Appeals for the Ninth Circuit.

DATED:  **September 12, 2016**

_____
Honorable Ronald E. Bush
Chief U. S. Magistrate Judge

**REPORT AND RECOMMENDATION - 24**